**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| SANDISK TECHNOLOGIES, INC. and SANDISK STORAGE MALAYSIA SDN. BHD., | Civil Action No.  7:26-cv-00019 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| VIASAT, INC., and GIGCASTERS, LLC, | |
| Defendants. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Sandisk Technologies, Inc. ("SDT Inc.") and SanDisk Storage Malaysia Sdn. Bhd. ("SDSM") (collectively, "Sandisk" or "Plaintiffs"), file this Complaint for patent infringement against Defendants Viasat, Inc. ("Viasat") and Gigcasters, LLC ("Gigcasters") (collectively, "Defendants"), and allege as follows:

**INTRODUCTION**

1.      Plaintiffs are technology pioneers that trace their history back to 1988, when Sundisk Corporation (later renamed "SanDisk Corporation") was founded by Eli Harari, Sanjay Mehrotra, and Jack Yuan.  Co-founder Eli Harari played a major role in the development of the first electrically erasable programmable read-only memory ("EEPROM").  And in 1991, SunDisk produced the first commercial flash-based solid-state drive ("SSD").

2.      Over the years, Sandisk's technology leadership has expanded.  Sandisk has grown from pioneering flash memory to shaping today's data-centric world.  Sandisk now designs, develops, and manufactures a wide variety of innovative products, including solid state drives, embedded flash products, USB drives, wireless media drives, digital media players, and wafers

1

and components.  Throughout, Sandisk has earned a reputation for reliability, performance, and design leadership across consumer, client, and enterprise storage solutions.

3.     Sandisk's culture of innovation is reflected in industry recognition.  For example, Sandisk Corporation, Plaintiffs' parent company, has been named as one of Thomson Reuters' "Top 100 Global Innovators" for multiple years.  Sandisk Corporation employs approximately 11,000 people across the globe to design and deliver storage solutions trusted by consumers and enterprises worldwide.  Sandisk's culture of innovation is further reflected in its ongoing advances in NAND technologies and storage architectures that power everything from smartphones to hyperscale data centers, as well as Sandisk's robust and expanding patent portfolio, including the patents asserted here.

4.     The patents at issue in this case are U.S. Patent Nos. 11,757,854 ("the '854 Patent"); 12,273,330 ("the '330 Patent"); 9,424,400 ("the '400 Patent"), and 10,447,667 ("the '667 Patent") (collectively, the "Sandisk Patents").  These Sandisk Patents represent ground-breaking innovations in secure digital content delivery and rights management for streaming media.  In particular, the Sandisk Patents cover systems and methods that can securely deliver live or on-demand media content by preloading, buffering, and/or controlling access to encrypted media stored on network-attached storage devices.  These approaches avoid reliance on small, device-side buffers or continuous real-time transmission over a wide-area network.  The innovations described and claimed in the Sandisk Patents improve the media streaming experience, even where bandwidth is constrained, and address longstanding vulnerabilities in conventional digital rights management ("DRM") systems.

5.     Viasat and Gigcasters have infringed and continue to infringe, both directly and indirectly, jointly and individually, the Sandisk Patents.  Further, they have directly benefited from

incorporating Sandisk's patented technology into their own product offerings directed to delivering media streaming in bandwidth-constrained situations.

6.    Specifically, Viasat sells and offers for sale Viasat's IPTV product, which delivers live TV via satellite to customer aircraft so that passengers can watch TV in real time either on the aircraft's seatback screens or on their own personal devices.  Viasat's IPTV system and services, which include the IPTV ground segment, satellite segment, onboard hardware and software, and all other hardware, software and services related to Viasat's provisioning of IPTV content, make use of Sandisk's patented technology and, thus, are collectively referred to as the "Accused Product."

7.    Viasat describes its IPTV product as delivering live TV broadcasts via satellite to a customer aircraft so that passengers can watch TV in real time on the aircraft's seatback screens and/or on their personal devices.[1]  Viasat further describes its IPTV product as a "flexible airborne solution" with "tailored channels and dedicated support" that "operates over an already installed Viasat SATCOM terminal."[2]  According to Viasat, IPTV allows, *inter alia*:

- Access to live news without relying on streaming services;

- SATCOM TV viewing without impacting mission-critical, bandwidth-intensive communications; and

- Combining TV with data connections – utilizing one terminal for C2 communications and situational awareness.[3]

---

[1] *See* Viasat Brings In-Flight Connectivity and Live Television to New JetBlue A220-300 and A321neo Long Range Aircraft (January 13, 2026), https://www.prnewswire.com/news-releases/viasat-brings-in-flight-connectivity-and-live-television-to-new-jetblue-a220-300-and-a321neo-long-range-aircraft-301297437.html?utm_source=chatgpt.com

[2] *See* Viasat, *Innovations that Amplify Mission-Critical Airborne Technology* (January 13, 2026), https://www.viasat.com/products/software-and-services/airborne-technology/.

[3] *Id.*

These features are made possible by Viasat's use of Sandisk's patented technology.

8.    Gigcasters, for its part, is involved in the development and operation of the Accused Product.  On information and belief, Gigcasters provides portions of the Accused Product's "ground segment," which is responsible for ingesting, transcoding, encrypting, and authorizing content for delivery to aircraft.

9.    Before the filing of this lawsuit, SDT Inc. and other related entities informed Viasat of its infringement of at least the '400 and '667 Patents.  Yet Viasat has continued to make extensive, unauthorized use of Sandisk's patented technologies without seeking permission or providing compensation.  Sandisk brings this suit to protect its rights and put an end to the Defendants' ongoing and willful infringement.

## THE PARTIES

10.    Plaintiff SDT Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 951 Sandisk Drive, Milpitas, California 95035.

11.    Plaintiff SDSM is a Malaysia-based manufacturing business organized and existing under the laws of Malaysia, with a principal place of business in Batu Kawan, Malaysia.  SDSM engages in the manufacture, assembly, and testing of various NAND flash memory components.

12.    One information and belief, Viasat is a corporation organized and existing under the laws of the State of Delaware.  Viasat maintains several places of business within Texas, including at the following locations:

- **Midland** – 2803 West County Rd 111, Midland, TX 79706;

- **Austin** – 600 Congress Ave, 14th Floor, Austin, TX 78701;

- **College Station** – 3902 South Traditions Drive, College Station, TX 77845; and

4

- **Houston (two locations)** – 15115 Park Row, Suite 300, Houston, TX 77084 and 9310 Kirby Drive, Street 800, Houston, TX 77054.[4]

13.    Viasat does business across the United States, including in the State of Texas and in the Western District of Texas.  Among other things, Viasat provides live IPTV via satellite to commercial and private aviation customers throughout the United States, including to customers in this District.

14.    On information and belief, Gigcasters is a limited liability company organized and existing under the laws of the State of Delaware.  Gigcasters's headquarters and only office is located in Austin, Texas at 115 Wild Basin Rd Suite 102 Austin, TX 78746.

15.    Gigcasters is involved in the development and operation of the Accused Product. On information and belief, Gigcasters provides portions of the Accused Product's "ground segment," which is responsible for ingesting, transcoding, encrypting, and authorizing content for delivery to aircraft.  For example, in a separate litigation between Viasat and Sandisk (*Sandisk I*), Viasat made publicly available a document showing "Gigcasters Austin" as forming part of the Accused Product's ground segment:[5]

---

[4] *See* Viasat Locations (January 13, 2026), https://www.viasat.com/about/company/locations/.
[5] *Sandisk Technologies, Inc. et al. v. Viasat, Inc.*, No. 22-cv-04376-HSG (N.D. Cal.) (hereinafter "*Sandisk I*"), Dkt. 219 at 103 (annotated).



16.    Gigcasters' involvement in developing and provisioning aspects of the Accused Product is further made clear from other public sources.  For example, another Viasat document made publicly available in *Sandisk I* is titled "Live TV Overview":[6]

---

[6] *Sandisk I*, Dkt.  257-10, Ex.  31 at 1.



The second page of this document lists "The Gigcasters Team," which, on information and belief, participated with Viasat in the development and implementation of the Accused Product:[7]

17.    Further, Gigcasters advertises on its website that it provides live streaming services, including services for capturing, encoding, and delivering live video content in real time:[8]



**LIVE STREAMING**

Capture, encode, and deliver your live video content to your
audience, on your site, in real time.

MORE INFO

18.    Still further, Gigcasters's CFO, Nate LaTour, has stated that "GIGCASTERS provides **end to end streaming solutions** for content creators and distributors **to deliver Live and VOD video content** to all platforms and audiences."[9]  Mr. LaTour explains that "Gigcasters also provides system design, integration and software development for OTT, broadcast & **Satellite based streaming enterprises.**"[10]

19.    As additional evidence, Sita (Sangeetha) Sasi, Gigcasters's technical product manager, has stated that she "Led in-flight entertainment **Live-TV initiative for domestic and international airlines**."[11]   In a document made publicly available in *Sandisk I*, Ms.  Sasi was listed as a "Technical Product Owner" of the Gigcasters Team with respect to the Accused Product.[12]

---

[8] Gigcasters (January 13, 2026), https://www.gigcasters.com/
[9] LinkedIn, Nate LaTour (January 13, 2026), https://www.linkedin.com/in/nate-latour-51071353/. (emphasis added).
[10] *Id.*  (emphasis added).
[11] LinkedIn, Sita S. (January 13, 2026),  https://www.linkedin.com/in/sitasasi/ (emphasis added).
[12] *Sandisk I*, Dkt.  257-10, Ex.  31 at 2.

20.     Finally, Sean T. Barnicle, an investor in Gigcasters from 2015 to the present, similarly describes Gigcasters' role in "deliver[ing] advanced streaming solutions and consulting services for satellite internet providers in the aviation industry – helping partners bring high-quality content experiences to connected aircraft worldwide."[13]



## JURISDICTION AND VENUE

21.     This action arises under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, including § 271.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

22.     This Court has personal jurisdiction over Defendants. Defendants have done business in this District, have committed and continue to commit acts of patent infringement giving rise to this action within Texas, including in this District, and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

23.     On information and belief, Defendants conduct substantial business in this forum, including: (a) engaging in the infringing conduct alleged herein in Texas and this District; (b)

---

[13] LinkedIn, Sean T. Barnicle (January 13, 2026), https://www.linkedin.com/in/sean-t-barnicle-727a745/

regularly and consistently doing and soliciting business in Texas and in this District; (c) deriving substantial revenue by offering and providing the accused IPTV service to commercial and/or private aviation customers that operate in and fly above Texas and this District; (d) promoting and inducing customers and users to use the Accused Product in Texas and in this District; (e) engaging in other persistent courses of conduct such as providing customer service and product support in Texas and in this District; and (e) purposefully establishing substantial, systematic, and continuous contacts with the state of Texas and with this District such that they should reasonably expect to be subject to suit here in this District. Indeed, Viasat has availed itself of the laws and protections of this District in recent years by filing and maintaining patent infringement lawsuits in this District, including against SDT Inc. *See Viasat, Inc. v. Sandisk Techs., Inc.*, 6:21-cv-1230 (originally filed in Nov. 2021); *Viasat, Inc. v. KIOXIA Corp.*, 6:21-cv-1231 (filed Nov. 2021). These lawsuits are ongoing in this District.

24.    Viasat conducts additional substantial business in Texas and in this District, including at its corporate locations in Midland, Texas and Austin, Texas, both of which are located in this District. Viasat also conducts substantial business at its corporate locations in College Station, Texas and at its two locations in Houston, Texas. On information and belief, Viasat conducts substantial business in these locations related to providing the Accused Product to customers and supporting the Accused Product, in addition to substantial business related to its other product offerings, which include In-Flight Entertainment (IFE) and/or Wireless In-Flight Entertainment (W-IFE), as well as satellite internet products for aviation customers as well as satellite home internet.

10

25.     In particular, Viasat is one of the two major U.S. satellite internet providers offering service to nearly 100 percent of the country, reaching 327.0 million people.[14] Viasat's satellite internet service is available in all 50 states, including Texas, and is specifically made available to customers in this District.[15]

26.     Gigcasters conducts substantial business in Texas and in this District, including at its only business location in Austin, Texas, which is located in this District.

27.     Defendants, directly and indirectly through subsidiaries and intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, making, using, selling, offering to sell, and importing products that infringe the asserted patents.

28.     Venue is proper in this District under 28 U.S.C. § 1400(b) because, among other things, Defendants have committed acts of infringement in this District and have maintained regular and established places of business in this District, including at least at 803 West County Rd 111, Midland, TX 79706 (Viasat), 600 Congress Ave, 14th Floor, Austin, TX 78701 (Viasat), and 115 Wild Basin Rd Suite 102 Austin, TX 78746 (Gigcasters).

29.     Joinder of the Defendants is proper pursuant to 35 U.S.C. § 299 and Fed. R. Civ. P. 20(a) because: (1) the Defendants are both involved in infringing, contributing to the infringement of, and/or actively inducing the infringement by others of the Sandisk Patents; (2) this case will involve questions of fact common to all Defendants; and (3) the Defendants' infringing acts arise out of the same transaction, occurrence, or series of transactions or occurrences related to the making, using, offering for sale, or selling of the Accused Product, as described further herein.

---

[14] *See* Viasat Internet Availability (January 13, 2026), https://broadbandnow.com/Viasat-Internet
[15] *See id.*

## SANDISK'S INTELLECTUAL PROPERTY

30.    Through years of sustained investment, technical development, and commercial execution, Sandisk has emerged as a global leader in secure digital content delivery and storage technologies.  Sandisk Corporation—the parent of both SDT Inc. and SDSM—is the culmination of this long-standing platform of innovation.  Sandisk Corporation became listed as a public company in February 2025.  Before that, it operated within the Western Digital enterprise, where substantial research and development efforts were undertaken and where the inventions underlying the Sandisk Patents were conceived, prosecuted, and protected.  As part of Western Digital's corporate reorganization and spin-off of Sandisk Corporation, the ownership of all rights, title and interest in the Sandisk Patents transferred to the Plaintiffs as the rightful owners and commercial beneficiaries of the innovative technologies at issue.

31.    The '854 Patent, entitled "Secure Stream Buffer on Network Attached Storage," was duly and legally issued by the United States Patent and Trademark Office on September 12, 2023.  A true and correct copy of the '854 Patent is attached as **Exhibit 1**.  The claims of the '854 Patent are valid and enforceable.

32.    The '330 Patent, entitled "Access-Controlled Delivery of Content to Network Attached Storage," was duly and legally issued by the United States Patent and Trademark Office on April 8, 2025.  A true and correct copy of the '330 Patent is attached as **Exhibit 2**.  The claims of the '330 Patent are valid and enforceable.

33.    The '667 Patent, entitled "Secure Stream Buffer on Network Attached Storage," was duly and legally issued by the United States Patent and Trademark Office on October 15, 2019.  A true and correct copy of the '667 Patent is attached as **Exhibit 3**.  The claims of the '667 Patent are valid and enforceable.

34.    The '400 Patent, entitled "Digital Rights Management System Transfer of Content and Distribution," was duly and legally issued by the United States Patent and Trademark Office on August 23, 2016.   A true and correct copy of the '400 Patent is attached as **Exhibit 4**.   The claims of the '400 Patent are valid and enforceable.

35.    Each of the '854 Patent, '330 Patent, and '667 Patent describe existing technical problems in the field of digital content streaming, including the deterioration of streaming quality (hiccups, stalls, etc.) caused by ISP throttling and/or network congestion.  The shared specification of the '854 Patent, '330 Patent, and '667 Patent explains that ISPs may intentionally slow down service, including video streaming service, which can degrade the quality of service at the display when a next packet is delayed.  These problems are compounded by the fact that end-user display devices typically have very small buffers to keep display device cost low and to limit the misappropriation of content.  Further, as the specification describes, while conventional content providers prefer small client device buffers to maintain control of distribution, such small buffers exacerbate Quality of Service ("QoS") issues when bandwidth is limited.  Each of the '854 Patent, '330 Patent, and '667 Patent recite concrete technical improvements that address and resolve these technical problems.  The '854 Patent, '330 Patent, and '667 Patent provide technical solutions by introducing, *inter alia*, a secure buffer implemented on a network-attached storage ("NAS") device located within the user's local network.  This NAS device can be controlled by a remote content provider, which allows content to be pre-loaded, time-shifted, and securely buffered without exposing the content to unauthorized users.  This architecture improves network performance and playback reliability while preserving Digital Rights Management ("DRM") enforcement and reducing load on constrained display hardware.

36.    The systems described and claimed in the '854 Patent, '330 Patent, and '667 Patent can preload content to a secure region on the NAS when bandwidth is available and/or based on user preferences, enabling time-shifting of large assets (including 4K media) to off-peak periods. The NAS having a secure region for buffering also supports burst transmission in larger bursts than a small display buffer could accept, so that playback can continue at the display even when subsequent Wide-Area Network ("WAN") delivery is delayed.    This improves QoS.    The architectures described and claimed in the '854 Patent, '330 Patent, and '667 Patent also support permitted conversion from protected delivery to user ownership, including transferring content from the secure region to the user-accessible region with associated keys or reallocating the storage zone to a user region of the NAS pursuant to specific instructions.    As these patents describe, the architecture described and claimed in the patents provide concrete operational improvements over conventional systems, including that:

- The NAS can enforce provider instructions to control user access (including encryption type and amount stored) for the secure region, maintaining provider control after delivery to the home network;

- The system supports provider-scheduled preloading to the secure buffer and selection based on user queues and/or profiles, enabling time-shifting and/or burst transmission for uploading content;

- The NAS can present content from the secure region to the display as encrypted content, with decryption at the display device, preserving protection end-to-end within the local network path;

- In some disclosed embodiments, VPN tunneling is used for receiving the stream to avoid selective throttling and further secure delivery; and

- The system can move content and associated keys from a secure portion of the NAS into the user area or re-allocate the secure portion to a user portion per provider instructions.

37.    The systems of the '854 Patent, '330 Patent, and '667 Patent thus preserve provider control (e.g., encryption type, storage amount) while materially improving QoS at playback, all

without expanding display buffers or relying on real-time internet conditions. These are specific, technical improvements to a video streaming environment.

38. The claims of the '854 Patent do not recite an abstract idea—such as "content delivery" or "media access control"—at a high level of generality. Instead, the '854 Patent claims recite specific structural components and interactions, including a streaming device, a storage device on a local area network with an available secure region, network interface circuitry, processors, a secure storage buffer, and access keys, all cooperating in a defined and organized way to establish a secure storage buffer controlled by a remote content provider and to obtain content from that buffer. The '854 Patent claims further require concrete technical steps, such as: (1) finding a storage device on the local area network with an available secure region for storing digital content; (2) sending connection information to establish a secure storage buffer in the storage device; (3) pre-loading digital content; (4) receiving access keys to pre-loaded copies of the digital content; and (5) obtaining the content from the storage device using the access key. These concrete technical steps tie the invention to particular machines and network configurations rather than to mental processes or generic data handling. The claims of the '854 Patent therefore recite specific, unconventional technical improvements to network streaming systems and storage architectures and not an abstract idea.

39. The claims of the '330 Patent similarly recite specific structural components and interactions between components, rather than an abstract idea. The '330 Patent claims recite a networked architecture in which a NAS device within a local area network has a dual-region storage configuration, such that a first region of the NAS device is user-accessible, while a second region of the device is non-user-accessible. The '330 Patent claims further require, *inter alia*, processors configured to transmit digital content to the NAS device and to transmit instructions to

the NAS device to control streaming access to digital content by reallocating a portion of the secure region to the user accessible region. By enabling encrypted content to be preloaded, buffered, and selectively accessed from the secure region, the claimed inventions of the '330 Patent improve streaming reliability and QoS while avoiding the need to increase buffering capacity on endpoint display devices. The claims thus represent specific, unconventional technical improvements to network streaming systems and storage architectures. By buffering encrypted streaming content in a secure region on a NAS device, the claimed architecture reduces reliance on display-side buffers and reduces the extent to which playback must track real-time wide-area network ("WAN") packet delivery during throttling, congestion, or other periods of low bandwidth. And it does this all while maintaining proper DRM control and avoiding unauthorized user access or misappropriation.

40. The claims of the '667 Patent similarly recite specific network components, storage structures, and operations arranged in a particular manner. The claims require: (1) a network interface adapter; (2) a NAS device operating on a local area network; (3) a secure buffer region on the NAS whose access is controlled by the media streaming system; and (4) one or more hardware processors configured to (a) receive an indication of the NAS having a secure region; (b) transmit digital content to the secure region within the NAS device for playback by a separate display device; and (c) transmit instructions to the NAS device to control streaming access to the buffered content. Additional dependent claims further require: (1) time-shifting transmissions, (2) encrypting of content to secure it to the secure region of the NAS device, (3) controlling the amount of data stored and the encryption type used, and (4) selectively moving or reallocating content to an accessible region with appropriate permissions or instructions. The claims of the '667 Patent thus tie its inventions to a concrete network topology and defined storage mechanisms, rather than

to generalized information processing or content delivery concepts. By transmitting digital content to a secure region of the NAS device that functions as a controlled buffer, and by enabling time-shifted delivery or burst transmission in periods of greater bandwidth availability, the claimed systems improve playback reliability and QoS while reducing network congestion and avoiding interruptions caused by throttling or low bandwidth. This constitutes a technical solution to a problem rooted in computer networking and streaming infrastructure.

41.    The '400 Patent is directed to solving long-standing technical problems in digital rights management ("DRM") systems, including widespread circumvention of software-based DRM, unauthorized copying of digital content, and the inability of prior systems to securely transfer content between storage devices without exposing cryptographic information. Conventional DRM systems relied heavily on host software and static keys that could be extracted, cloned, or reused by unauthorized users, thus undermining content protection. The '400 Patent describes unconventional technical solutions by introducing, among other things: (1) storage devices with a hardware root of trust, (2) tying digital content to a specific storage device; and (3) the use of cryptographic modules that generate, store, and protect keys. This architecture materially improves security by preventing cloned media, copied keys, or duplicated storage devices from allowing unauthorized access to protected content.

42.    The claims of the '400 Patent recite specific cryptographic architectures with concrete physical components having specific structural relationships and interactions, including a remote trusted server and a portable data storage device, along with data interfaces permitting communication between the remote trusted server and the portable data storage. The claimed architectures also require a processor configured to perform the unconventional action of obtaining a unique identifier that is both specific to, and concealed by, the portable data storage device. The

processor must also: (1) authenticate the portable data storage device using at least this unique identifier by communicating with the remote trusted server; and then (2) provide encrypted media content to the portable data storage device.  Dependent claims of the '400 Patent require additional concrete structures, including: (1) structures for generating ephemeral keys for enhanced security; and (2) a portable data storage device that has both (a) a defined user area for storing encrypted media content that is accessible by a playback device; and (b) a non-user area for storing cryptographic data that is not accessible by the playback device.  The claims of the '400 Patent thus tie the inventions therein to particular machines and storage architectures that change how content is physically stored, transferred, and rendered, rather than merely describing the concept of "protecting digital content" at a functional or generic level.  As a result, the claims of the '400 Patent are not abstract.

43.    The claims of the '400 Patent do not recite routine or conventional computer activity.  Rather, the '400 Patent discloses and claims non-conventional cryptographic techniques, such as: (1) generating binding keys that are unique to a portable data storage device; (2) ephemerally generating keys within specific secure hardware; (3) separating data across secured user and non-user storage regions; and (4) brokering secure content transfers through trusted servers or two-way authenticated channels.  These techniques ensure that neither copied media nor storage devices can independently decrypt content, and allow for different components of the system to engage in novel two-way authentication to establish mutual trust.  This represents a significant technical improvement to the functioning of storage devices and DRM systems themselves.  Accordingly, the claims of the '400 Patent recite concrete, hardware-based solutions to technological problems rooted in computer security and digital content distribution, and are thus directed to patent-eligible subject matter.

**OTHER LITIGATION BETWEEN THE PARTIES**

44.     This is not the first patent litigation between Viasat and Sandisk.  On November 29, 2021, Viasat sued Western Digital Corporation and Western Digital Technologies, Inc. in this District, alleging infringement of two patents in the field of flash memory.  *See Viasat, Inc. v. Sandisk Techs., Inc.*, 6:21-cv-1230 (*"Viasat v. SDT Inc."*), Dkt. 1.  When *Viasat v. SDT Inc.* was filed, Sandisk Corporation was part of Western Digital Technologies, Inc.  Since then, Sandisk Corporation has separated from Western Digital Technologies and SDT Inc. has assumed all activities in connection with the products accused in *Viasat v. SDT Inc*.  *Id.* at Dkt. 209.  Thus, on August 28, 2025, the parties filed a joint motion to recaption that case with SDT Inc. as the defendant.  *Id.*

45.     Western Digital Technologies, Inc. filed petitions for *inter partes* review as to both patents asserted in *Viasat v. SDT Inc*.  Both IPRs were instituted.  Ultimately, the PTAB issued final written decisions as to both.  As to one asserted patent, the PTAB found all challenged claims unpatentable.  As to the other asserted patent, the PTAB found some challenged claims unpatentable.  *Viasat v. SDT Inc.* is currently stayed pending appeal of one of those final written decisions.  *Id.* at Dkt. 205.

46.     On July 28, 2022, Western Digital Technologies, Inc., Western Digital Ireland Ltd., Sandisk 3D IP Holdings LTD., Sandisk Technologies LLC, and SDSM sued Viasat in the Northern District of California, alleging infringement of three patents, including the '400 and '667 Patents at issue in this case.  *Sandisk I*, No. 22-cv-04376-HSG (N.D. Cal.), Dkt. 1.  As with *Viasat v. SDT Inc.*, that case was later recaptioned, so that the Western Digital entities were terminated and SDT Inc. and SDSM became the named plaintiffs.  *Id.* at Dkt. 130.  Final judgement was entered in *Sandisk I* on November 17, 2025.

47.     While *Sandisk I* involved two of the four patents at issue in this case, the allegations in this case are directed to a different accused product with substantially different functionality. *See Sandisk I* at Dkt. 199 at 14 (Viasat arguing that IPTV and another product accused in *Sandisk I* are "separate products purchased by separate customers"). Specifically, the *Sandisk I* infringement allegations that were addressed on their merits in that case were directed to Viasat's in-flight connectivity and on-demand in-flight offerings, and not to Viasat's Live TV/IPTV product accused here. The *Sandisk I* court definitively ruled that IPTV was not accused. Sandisk therefore brings this action to protect its rights and to pursue two additional patents against Viasat's Live TV/IPTV product. None of Sandisk's claims in this matter are precluded by prior litigation between the parties.

48.     Given the above litigation history, Viasat has had notice of the *Sandisk I* plaintiffs' infringement allegations against Viasat's Live TV/IPTV product as to the '400 and '667 Patents since at least early 2025. Viasat's ongoing infringement since then has thus been willful.

## COUNT ONE: INFRINGEMENT OF THE '854 PATENT

49.     Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

50.     Plaintiffs own, by assignment, all rights, title, and interest in and to the '854 Patent, including the right to sue and recover for infringement thereof. Plaintiffs own all rights, title and interest in the '854 Patent by virtue of a properly executed series of assignments and/or licenses flowing from the inventors to Plaintiffs.

51.     Viasat, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '854 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United

States.  In so doing, Viasat has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '854 Patent, including claim 1.

52.    The '854 Patent was filed on November 23, 2021 and issued on September 12, 2023.  On information and belief, Viasat has had actual knowledge of the '854 Patent and its infringement thereof as of at least the date the '854 Patent issued.  This is so because, given that Viasat was in active patent litigation in *Sandisk I* at the time, on information and belief, Viasat was tracking both: (1) continuation applications stemming from the patents that the plaintiffs had asserted in that case; and (2) its potential infringement thereof.  The '854 Patent issued from a continuation application stemming from the '667 Patent, which was asserted in *Sandisk I* beginning in July 2022.  In light of this, and given Viasat's detailed knowledge of the accused IPTV/Live TV systems it makes and operates and/or causes others to operate, as well as Viasat's role in deploying and supporting those IPTV systems for customers, Viasat had actual knowledge of the '854 Patent and its infringement thereof as of at least the date the '854 Patent issued.  At the least, Viasat has had knowledge of its infringement of the '854 Patent since the *Sandisk I* plaintiffs explained their infringement allegations against the IPTV/Live TV systems as to the '667 Patent during the pendency of *Sandisk I* as of at least early 2025.

53.    Viasat's knowledge of the asserted patent family and of Western Digital and Sandisk's enforcement efforts in *Sandisk I*—combined with Viasat's own position that IPTV is a separate product and the court's ruling that IPTV was not accused in the prior litigation—put Viasat on notice that its IPTV product and associated ground/onboard components would be the subject of a separate action, as pleaded here.  Viasat has known, or has been willfully blind to, the fact that making, using, offering to sell, selling, and/or importing the Accused Product into the United States would constitute infringement of the '667 Patent and later patents descending therefrom.

54.     Further, and in any event, Viasat has had actual knowledge of its infringement of the '854 Patent since no later than the filing date of this Complaint.

55.     In addition, as of the time the '854 Patent issued, or at least as of the service of this Complaint, Viasat has induced, and continues to induce, infringement of one or more claims of the '854 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others—including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers including Gigcasters—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Viasat has promoted use of the Accused Product and participated in encouraging airline customers to use functionality of the Accused Product that is covered by the '854 Patent.  For example, Viasat promotes advantages of the Accused Product enabled by Claim 1 of the '854 Patent, stating that "IPTV allows: access to live news without relying on streaming services [and] SATCOM TV viewing without impacting mission-critical, bandwidth intensive communications . . . ."[16]  Through these and other statements promoting the Accused Product, Viasat intends and induces customers, including airlines, military customers, and passenger end users, to adopt and deploy the Accused Product in an infringing way, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Viasat's acts of inducement also include providing installation services, information, and instructions and providing the Accused Product to others.  In summary, Viasat induces infringement of the '854 Patent by advertising, encouraging, and promoting the Accused Product, including its specific infringing functionality to airline customers, private aviation customers, military customers,

---

[16] Viasat, *Innovations that Amplify Mission-Critical Airborne Technology* (Jan. 13, 2026), https://www.viasat.com/products/software-and-services/airborne-technology/.

passengers, and others by providing documentation and instructions describing operation and use of the accused features, as well as by providing ongoing support to enable customers and end users to access and use the Accused Product functionality during flights.  On information and belief, Viasat has done so with knowledge of the '854 Patent and knowledge that the encouraged acts constitute infringement.

56.    Further, on information and belief, Viasat knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '854 Patent. The hardware, software, products, and services supplied by Viasat in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Viasat are a material part of the invention of the '854 Patent.  Accordingly, in violation of 35 U.S.C. § 271(c), Viasat is also contributing, directly and/or through intermediaries, to the direct infringement of the '854 Patent.

57.    Gigcasters, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '854 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States.  In so doing, Gigcasters has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '854 Patent, including claim 1.

58.    On information and belief, Gigcasters has had actual knowledge of the '854 Patent and its infringement thereof since before and/or at the time the '854 Patent issued.  This is so because of: (1) Gigcasters' close working relationship with Viasat; (2) Viasat's knowledge of the '854 Patent and its infringement thereof alleged above; (3) the pendency of continuation applications in the same patent family as the '667 Patent asserted in *Sandisk I*;  (4) Gigcasters'

detailed knowledge of the accused IPTV/Live TV systems, including the systems that Gigcasters makes, operates and/or causes others to operate; and (5) Gigcasters's role in deploying and supporting its systems for the accused IPTV system,

59.     Further, and in any event, Gigcasters has had actual knowledge of its infringement of the '854 Patent since no later than the filing date of this Complaint.

60.     In addition, as of the time the '854 Patent issued, or at least as of the service of this Complaint, Gigcasters has induced, and continues to induce, infringement of one or more claims of the '854 Patent, in violation of 35 U.S.C. § 271(b), by actively encouraging others—including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Gigcasters has promoted use of the Accused Product and participated in encouraging airline customers to use functionality of the Accused Product that is covered by the '854 Patent.  For example, Gigcasters representatives including its CFO Nate LaTour, technical product manager Sita (Sangeetha) Sasi, and investor Sean T. Barnicle, among others, have all promoted the Accused Product, including advantages enabled by Claim 1 of the '854 Patent, including in statements by these individuals identified above.  Through these and other statements promoting the accused IPTV/Live TV functionality, Gigcasters intends and induces customers including airlines, military customers, and passenger end users to adopt and deploy the Accused Product, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Gigcasters' acts of inducement also include providing installation services, information, and instructions for the Accused Product.  In summary, Gigcasters induces infringement of the '854 Patent by advertising, encouraging, and promoting the Accused Product to customers, passengers, military

customers, and others, by providing documentation and instructions describing operation and use of the accused features, and by providing ongoing support to enable customers and end users to access and use the Accused Product functionality during flights. Gigcasters has done so with knowledge of the '854 Patent and knowledge that the encouraged acts constitute infringement.

61.     Further, on information and belief, Gigcasters knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '854 Patent. The hardware, software, products, and services supplied by Gigcasters in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Gigcasters are a material part of the invention of the '854 Patent. Accordingly, in violation of 35 U.S.C. § 271(c), Gigcasters is also contributing, directly and/or through intermediaries, to the direct infringement of the '854 Patent.

62.     On information and belief, Viasat directs and controls the actions of Gigcasters with respect to its contributions to the Accused Product. In the alternative, Gigcasters and Viasat have entered into a joint enterprise by having an agreement between them, a common purpose, a community of pecuniary interest, and an equal right of control over the Accused Product.

63.     Claim 1[17] of the '854 Patent recites:

1. A streaming device configured to be coupled to a local area network, the streaming device comprising:

   a network interface circuitry configured to receive digital content from a remote content provider outside of the local area network; and

   one or more processors configured to execute one or more sequences of instructions which, when executed by the one or more processors, cause performance of:

---

[17] Plaintiff's infringement allegations are not limited to the claims specifically identified herein. Viasat and Gigcasters infringe other claims of the Patents-in-Suit based on similar attributes that are outlined in this Complaint.

finding a storage device on the local area network with an available secure region for storing digital content;

sending connection information for the storage device to the remote content provider to enable establishing a secure storage buffer in the storage device by the remote content provider, the secure storage buffer configured to enable the remote content provider to pre-load digital content on the storage device;

requesting a first digital content from the remote content provider;

receiving an access key to a pre-loaded copy of the first digital content stored on the storage device on the local area network; and

obtaining the first digital content from the storage device using the access key.

64.     The Accused Product infringes at least claim 1 of the '854 Patent.  The Accused Product includes a streaming device configured to be coupled to a local area network ("LAN"). As Viasat makes clear, the Accused Product enables multiple passengers on an airplane to watch live TV content on multiple different streaming devices.[18]



65.     On information and belief, the accused IPTV system utilizes a S4 server that includes storage for caching/storing IPTV content and is configured to operate on an onboard LAN.  Further on information and belief, this S4 server further connects to a M3 modem and to

---

[18] *See* Viasat, In-Flight Entertainment (January 13, 2026), https://www.viasat.com/aviation/commercial-aviation/in-flight-entertainment/ (annotated).

users' seatback displays via a wired Ethernet connection, and the S4 server also connects to users' personal electronic devices via wireless access points (WAPs).

66.　　On information and belief, the S4 server of the Accused Product is configured to receive and store digital IPTV content that is received via a satellite network ("from a remote content provider outside of the local area network").　On information and belief, Viasat's Video Content Delivery System (VCDS) transmits the digital IPTV content via the satellite network.　The architecture of the environment in which the Accused System operates is illustrated below:[19]



67.　　On information and belief, the system of the Accused Product comprises one or more hardware processors that find a storage associated with the S4 server, which storage provides an indication that it is present and available to the M3 modem.　Further, the accused IPTV system sends connection information to the remote content provider to enable the establishment of a

---

[19] Viasat In-Flight Connectivity Solutions (January 13, 2026), https://www.viasat.com/content/dam/us-site/aviation/documents/565522_In-flight_Connectivity_011_aag.pdf

secure storage buffer in the storage device, the VCDS transmits the digital IPTV content via a satellite network, and the storage associated with the S4 server caches/stores the live IPTV content as recited in claim 1.

68.     Further, on information and belief, the Accused Product includes an onboard system that uses VUDRM, a multi-device DRM service that keeps content protected and not viewable on unauthorized devices.   On information and belief, the accused IPTV system also uses AES encryption, utilizing per-item encryption keys.   When an authorized viewing device requests a specific piece of IPTV content, control information is provided to the S4 server to permit access to the digital IPTV content, and the IPTV content is made available either on a seatback device or a user's personal device, consistent with the claim language.

69.     The processors of the accused system support the creation and use of secure, non-user accessible storage on the onboard S4 server to store and control access to protected digital content.   On information and belief, the aircraft-based S4 server and ground-based content-delivery infrastructure exchange identification, addressing, and/or configuration information used in connection with delivering protected digital content to the aircraft-based system and coordinating content delivery, access control, and/or preloading.

70.     On information and belief, as part of the accused IPTV ground segment, Gigcasters ingests, encodes, and/or transcodes streaming content (including HTTP Live Streaming content) and transmits the encoded content and associated data for delivery over the satellite network to aircraft-based components that implement the claimed secure storage/buffering functionality.   On information and belief, Gigcasters provides hardware and/or software to implement this

functionality at Viasat's direction and as part of Viasat's IPTV workflow that results in establishing and using secure buffering on the aircraft-based system.[20]



71.     On information and belief, Gigcasters participates in providing requested live IPTV content at Viasat's direction as part of the ground segment by ingesting and encoding/transcoding live content obtained from content sources and transmitting that encoded content into the ground-segment workflow for delivery over the satellite network to aircraft.

---

[20] *See Sandisk I*, Dkt. 219 at 103 (annotated).

72.     Viasat is liable for infringement of the '854 Patent based on both its own acts and, to the extent Gigcasters supplies hardware and/or software or performs actions that contribute to satisfaction of the asserted claim limitations, Gigcasters supplies such hardware and/or software or actions at Viasat's direction and control.  In the alternative, and on information and belief, Viasat and Gigcasters operate in a coordinated manner within a shared commercial endeavor relating to the accused IPTV/Live TV functionality such that their conduct constitutes a joint enterprise. Plaintiffs reserve the right to supplement these allegations following discovery into the precise nature of the Viasat-Gigcasters relationship and allocation of responsibilities.

73.     As a direct and proximate result of Defendants' willful infringement of the '854 Patent, Plaintiffs have been and continue to be damaged.  Plaintiffs have also suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law unless Defendants' infringement is enjoined by this Court.

## COUNT TWO: INFRINGEMENT OF THE '330 PATENT

74.     Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

75.     Plaintiffs own, by assignment, all rights, title, and interest in and to the '330 Patent, including the right to sue and recover for infringement thereof.  Plaintiffs own all rights, title and interest in the '330 Patent by virtue of a properly executed series of assignments and/or licenses flowing from the inventors to Plaintiffs.

76.     Viasat, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '330 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States.  In so doing, Viasat has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '330 Patent, including claim 1.

77.     The '330 Patent was filed on August 4, 2023 and issued on April 8, 2025.  On information and belief, Viasat has had actual knowledge of the '330 Patent and its infringement thereof as of at least the date the '330 Patent issued.  This is so because, given that Viasat was in active patent litigation in *Sandisk I* at the time, on information and belief, Viasat was tracking both: (1) continuation applications stemming from the patents that the plaintiffs had asserted in that case; and (2) its potential infringement thereof.  The '330 Patent issued from a continuation application stemming from the '667 Patent, which was asserted in *Sandisk I* beginning in July 2022.  In light of this, and given Viasat's detailed knowledge of the accused IPTV/Live TV systems it makes and operates and/or causes others to operate, as well as Viasat's role in deploying and supporting those IPTV systems for customers, Viasat had actual knowledge of the '330 Patent and its infringement thereof as of at least the date the '330 Patent issued.  At the least, Viasat has had knowledge of its infringement of the '330 Patent since the *Sandisk I* plaintiffs explained their infringement allegations against the IPTV/Live TV systems as to the '667 Patent during the pendency of *Sandisk I* as of at least early 2025.

78.     Viasat's knowledge of the asserted family and of Western Digital and Sandisk's enforcement efforts in *Sandisk I*—combined with Viasat's own position that IPTV is a separate product and the court's ruling that IPTV was not accused in the prior litigation—put Viasat on notice that its IPTV product and associated ground/onboard components would be the subject of a separate action, as pleaded here.   Viasat has known, or has been willfully blind to, the fact that making, using, offering to sell, selling, and/or importing the Accused Product into the United States would constitute infringement.

79.     Further, and in any event, Viasat has had actual knowledge of its infringement of the '330 Patent since no later than the filing date of this Complaint.

80.     In addition, as of the time the '330 Patent issued, or at least as of the service of this Complaint, Viasat has induced, and continues to induce, infringement of one or more claims of the '330 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others—including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers including Gigcasters—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Viasat has promoted use of the Accused Product and participated in encouraging airline customers to use functionality of the Accused Product that is covered by the '330 Patent.  For example, Viasat promotes advantages of the Accused Product enabled by Claim 1 of the '330 Patent, stating that "IPTV allows: access to live news without relying on streaming services [and] SATCOM TV viewing without impacting mission-critical, bandwidth intensive communications . . . ."[21]  Through these and other statements promoting the Accused Product, Viasat intends and induces customers, including airlines, military customers, and passenger end users, to adopt and deploy the Accused Product in an infringing way, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Viasat's acts of inducement also include providing installation services, information, and instructions and providing the Accused Product to others.  In summary, Viasat induces infringement of the '330 Patent by advertising, encouraging, and promoting the Accused Product, including its specific infringing functionality, to airline customers, private aviation customers, military customers, passengers, and others by providing documentation and instructions describing operation and use of the accused features, as well as by providing ongoing support to enable customers and end users

---

[21] Viasat, *Innovations that Amplify Mission-Critical Airborne Technology* (Jan. 13, 2026), https://www.viasat.com/products/software-and-services/airborne-technology/.

to access and use the Accused Product functionality during flights. Viasat has done so with knowledge of the '330 Patent and knowledge that the encouraged acts constitute infringement.

81.    Further, on information and belief, Viasat knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '330 Patent. The hardware, software, products, and services supplied by Viasat in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Viasat are a material part of the invention of the '330 Patent. Accordingly, in violation of 35 U.S.C. § 271(c), Viasat is also contributing, directly and/or through intermediaries, to the direct infringement of the '330 Patent.

82.    Gigcasters, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '330 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States. In so doing, Gigcasters has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '330 Patent, including claim 1.

83.    On information and belief, Gigcasters has had actual knowledge of the '330 Patent and its infringement thereof since before and/or at the time the '330 Patent issued. This is so because of: (1) Gigcasters' close working relationship with Viasat; (2) Viasat's knowledge of the '330 Patent and its infringement thereof alleged above; (3) the pendency of continuation applications in the same patent family as the '667 Patent asserted in *Sandisk I*; (4) Gigcasters' detailed knowledge of the accused IPTV/Live TV systems, including the systems that Gigcasters makes, operates and/or causes others to operate; and (5) Gigcasters's role in deploying and supporting its systems for the accused IPTV system,

84.    Further, and in any event, Gigcasters has had actual knowledge of its infringement of the '330 Patent since no later than the filing date of this Complaint.

85.    In addition, as of the time the '330 Patent issued, or at least as of the service of this Complaint, Gigcasters has induced, and continues to induce, infringement of one or more claims of the '330 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others—including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Gigcasters has promoted use of the Accused Product and participated in encouraging airline customers to use functionality of the Accused Product that is covered by the '330 Patent.  For example, Gigcasters representatives, including its CFO Nate LaTour, technical product manager Sita (Sangeetha) Sasi, and investor Sean T. Barnicle, among others, have all promoted the Accused Product, including advantages enabled by Claim 1 of the '330 Patent, including in statements by these individuals identified above.  Through these and other statements promoting the accused IPTV/Live TV functionality, Gigcasters intends and induces customers including airlines, military customers, and passenger end users to adopt and deploy the Accused Product, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Gigcasters' acts of inducement also include providing installation services, information, and instructions for the Accused Product.  In summary, Gigcasters induces infringement of the '330 Patent by advertising, encouraging, and promoting the Accused Product to customers, passengers, military customers, and others, by providing documentation and instructions describing operation and use of the accused features, and by providing ongoing support to enable customers and end users to

access and use the Accused Product functionality during flights.  Gigcasters has done so with knowledge of the '330 Patent and knowledge that the encouraged acts constitute infringement.

86.    Further, on information and belief, Gigcasters knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '330 Patent. The hardware, software, products, and services supplied by Gigcasters in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Gigcasters are a material part of the invention of the '330 Patent.  Accordingly, in violation of 35 U.S.C. § 271(c), Gigcasters is also contributing, directly and/or through intermediaries, to the direct infringement of the '330 Patent.

87.    On information and belief, Viasat directs and controls the actions of Gigcasters with respect to its contributions to the Accused Product.  In the alternative, Gigcasters and Viasat have entered into a joint enterprise by having an agreement between them, a common purpose, a community of pecuniary interest, and an equal right of control over the Accused Product.

88.    Claim 1 of the '330 Patent recites:

1.  A media streaming system comprising:

a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and

one or more hardware processors configured, individually or in combination, to:

receive an indication of the NAS device comprising a buffer for streaming media, via the LAN, to a separate display device on the LAN, wherein the buffer comprises a secure region and a user accessible region;

transmit the digital content to the NAS device for playback by the separate display device from the buffer; and

transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer and instructions to reallocate a portion of the secure region to the user accessible region.

89.    The Accused Product infringes at least claim 1 of the '330 Patent.  The Accused Product includes a media streaming system that enables multiple passengers on an airplane using multiple different streaming devices to watch live TV content.[22]



90.    On information and belief, the Accused Product includes an M3 Modem and S4 Server that are configured to transmit digital IPTV content via a satellite network ("a Wide Area Network (WAN)" to a NAS.  The basic architecture of the Accused Product system is illustrated below:[23]

---

[22] Viasat, *In-Flight Entertainment* (January 13, 2026), https://www.viasat.com/aviation/commercial-aviation/in-flight-entertainment/

[23] Viasat In-Flight Connectivity Solutions (January 13, 2026), https://www.viasat.com/content/dam/us-site/aviation/documents/565522_In-flight_Connectivity_011_aag.pdf



91.    On information and belief, after the digital IPTV content is sent via the satellite network, the digital IPTV content is transmitted to a storage associated with the S4 server (a "network attached storage (NAS)"), which operates on a local onboard (LAN) network.    On information and belief, live TV content is cached/stored on the storage associated with the S4 server and then can be accessed by individual users. On information and belief, by continually updating and storing Live TV content on the S4 server, the TV content does not need to be re-transmitted over satellite to be viewed by each individual user on the aircraft.

92.    On information and belief, the system of the Accused Product includes on-board hardware processors used to service and deliver the IPTV content, including hardware processors on the M3 modem and S4 server.  On information and belief, the on-board NAS storage generates an indication received by processors on the M3 modem of the presence of the storage that comprises a buffer for streaming IPTV media via the LAN.  Further, on information and belief, the

accused system encrypts the storage associated with the S4 server, such that the NAS server has a buffer with a secure region.

93.    On information and belief, upon proper authorization of a user's device, the user is able to stream requested IPTV content from the user-accessible region of the system's NAS buffer. According to Viasat, the Accused Product can be used either on the aircraft's seatback screens or on users' personal devices.

94.    On information and belief, the digital IPTV content stored on the NAS associated with the S4 server is transmitted for playback to seatback display devices or users' personal devices, which are separate display devices from the buffer, as recited in the claim. Further, on information and belief and as discussed above, Viasat's onboard system uses VUDRM, a multi-vendor, multi-device DRM service, which keeps content protected and not viewable on unauthorized devices, and media content is further encrypted using AES encryption, using per-item encryption keys. On information and belief, the system sends control instructions to the S4 server that allow access to the content, including instructions to reallocate part of the secure region to a user-accessible region, so that users can watch the desired IPTV content.

95.    As a direct and proximate result of Defendants' willful infringement of the '330 Patent, Plaintiffs have been and continue to be damaged. Plaintiffs have also suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law unless Defendants' infringement is enjoined by this Court.

### COUNT THREE: INFRINGEMENT OF THE '667 PATENT

96.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

97.    Plaintiffs own, by assignment, all rights, title, and interest in and to the '667 Patent, including the right to sue and recover for infringement thereof. Plaintiffs own all rights, title and

interest in the '667 Patent by virtue of a properly executed series of assignments and/or licenses flowing from the inventors to Plaintiffs.

98.     Viasat, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '667 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States.  In so doing, Viasat has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '667 Patent, including claim 1.

99.     Viasat has had knowledge of the '667 Patent at least as of the date that Western Digital Technologies, Inc., Western Digital Ireland Ltd., Sandisk 3D IP Holdings LTD., Sandisk Technologies LLC, and SDSM filed *Sandisk I*, which asserted the '667 Patent against Viasat.

100.     On information and belief, given Viasat's detailed knowledge of the accused IPTV/Live TV systems it makes and operates and/or causes others to operate, and Viasat's role in deploying and supporting those IPTV systems for customers, Viasat has had knowledge of its infringement of the '667 Patent since the time the of service of the 2022 Complaint, if not before. At the least, Viasat has had knowledge of its infringement of the '667 Patent via the IPTV/Live TV systems since the *Sandisk I* plaintiffs explained their infringement allegations as to that patent and those systems during the pendency of *Sandisk I* as of at least early 2025.

101.     Viasat's knowledge of the asserted '667 Patent and of Western Digital and Sandisk's enforcement efforts in *Sandisk I*—combined with Viasat's position that IPTV is a separate product and the court's ruling that IPTV was not accused in the prior litigation—put Viasat on notice that its IPTV product and associated ground/onboard components would be the subject of a separate action, as pleaded here.   Viasat has known, or has been willfully blind to, the fact that making,

using, offering to sell, selling, and/or importing the Accused Product into the United States would constitute infringement.

102.    Further, in any event, Viasat has had actual knowledge of its infringement of the '667 Patent since no later than the filing date of this Complaint.

103.    In addition, as of the time the 2022 Complaint was served, as of the time the *Sandisk I* plaintiffs explained their relevant infringement allegations during *Sandisk I*, or at least as of the service of this Complaint, Viasat has induced, and continues to induce, infringement of one or more claims of the '667 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others— including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers including Gigcasters—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Viasat has promoted use of the Accused Product and participated in encouraging customers to use functionality of the Accused Product that is covered by the '667 Patent.  For example, Viasat promotes advantages of the Accused Product enabled by Claim 1 of the '667 Patent, stating that "IPTV allows: access to live news without relying on streaming services, SATCOM TV viewing without impacting mission-critical, bandwidth intensive communications . . . ."[24]  Through these and other statements promoting the Accused Product, Viasat intends and induces customers including airlines, military customers, and passenger end users to adopt and deploy the Accused Product in an infringing way, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Viasat's acts of inducement also include providing installation services, information, and instructions and

---

[24] Viasat, *Innovations that Amplify Mission-Critical Airborne Technology* (Jan. 13, 2026), https://www.viasat.com/products/software-and-services/airborne-technology/.

providing the Accused Product to others.  In summary, Viasat induces infringement of the '667 Patent by advertising, encouraging, and promoting the Accused Product, including its specific infringing functionality, to airline customers, private aviation customers, military customers, passengers, and others by providing documentation and instructions describing operation and use of the accused features, as well as by providing ongoing support to enable customers and end users to access and use the Accused Product functionality during flights.  Viasat has done so with knowledge of the '667 Patent and knowledge that the encouraged acts constitute infringement.

104.    Further, on information and belief, Viasat knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '667 Patent. The hardware, software, products, and services supplied by Viasat in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Viasat are a material part of the invention of the '667 Patent.  Accordingly, in violation of 35 U.S.C. § 271(c), Viasat is also contributing, directly and/or through intermediaries, to the direct infringement of the '667 Patent.

105.    Gigcasters, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '667 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States.  In so doing, Gigcasters has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '667 Patent, including claim 1.

106.    On information and belief, given Gigcasters' close relationship with Viasat, given that the '667 Patent was asserted in *Sandisk I*, and given Gigcasters' detailed knowledge of the accused IPTV/Live TV systems, including the systems that Gigcasters makes, operates and/or

causes others to operate, and Gigcasters's role in deploying and supporting its systems for the accused IPTV system, Gigcasters had actual knowledge of the '667 Patent and its infringement as of or around the time the 2022 Complaint was served, or at least when the *Sandisk I* plaintiffs explained their relevant infringement allegations during *Sandisk I*.

107.    Further, in any event, Gigcasters has had actual knowledge of its infringement of the '667 Patent since no later than the filing date of this Complaint.

108.    In addition, as of the time the 2022 Complaint was served, as of the date the *Sandisk I* plaintiffs explained their relevant infringement allegations in *Sandisk I*, or at least as of the service of this Complaint, Gigcasters has induced, and continues to induce, infringement of one or more claims of the '667 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others— including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Gigcasters has promoted use of the Accused Product and participated in encouraging airline customers to use functionality of the Accused Product that is covered by the '667 Patent.  For example, Gigcasters representatives, including its CFO Nate LaTour, technical product manager Sita (Sangeetha) Sasi, and investor Sean T. Barnicle, among others, have all promoted the Accused Product, including advantages enabled by Claim 1 of the '667 Patent, including in the statements by these individuals identified above.  Through these and other statements promoting the accused IPTV/Live TV functionality, Gigcasters intends and induces customers, including airlines, military customers, and passenger end users, to adopt and deploy the Accused Product, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Gigcasters' acts of inducement also include providing installation services, information, and

instructions for and/or relating to the Accused Product. In summary, Gigcasters induces infringement of the '667 Patent by advertising, encouraging, and promoting the Accused Product to customers, passengers, military customers, and others, by providing documentation and instructions describing operation and use of the accused features, and by providing ongoing support to enable customers and end users to access and use the Accused Product functionality during flights. Gigcasters has done so with knowledge of the '667 Patent and knowledge that the encouraged acts constitute infringement.

109.    Further, on information and belief, Gigcasters knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '667 Patent. The hardware, software, products, and services supplied by Gigcasters in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Gigcasters are a material part of the invention of the '667 Patent. Accordingly, in violation of 35 U.S.C. § 271(c), Gigcasters is also contributing, directly and/or through intermediaries, to the direct infringement of the '667 Patent.

110.    On information and belief, Viasat directs and controls the actions of Gigcasters with respect to its contributions to the Accused Product. In the alternative, Gigcasters and Viasat have entered into a joint enterprise by having an agreement between them, a common purpose, a community of pecuniary interest, and an equal right of control over the Accused Product.

111.    Claim 1 of the '667 Patent recites:

1. A media streaming system comprising:

> a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and

> one or more hardware processors configured to:

receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and

transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.

112.    The Accused Product infringes at least claim 1 of the '667 Patent.  The Accused Product includes a media streaming system that enables multiple passengers on an airplane to watch live TV content on multiple streaming devices.[25]



113.    On information and belief, the Accused Product includes an M3 Modem and S4 Server that are configured to transmit digital IPTV content via a satellite network ("a Wide Area Network (WAN)" to a NAS associated with a S4 server that operates on a local area network (LAN) onboard the aircraft.  The basic architecture of the Accused Product system is illustrated below:[26]

---

[25] *See* Viasat, In-Flight Entertainment (January 13, 2026), https://www.viasat.com/aviation/commercial-aviation/in-flight-entertainment/ (annotated).

[26] Viasat In-Flight Connectivity Solutions (January 13, 2026), https://www.viasat.com/content/dam/us-site/aviation/documents/565522_In-flight_Connectivity_011_aag.pdf



114.    On information and belief, after the digital IPTV content is sent via the satellite network, the digital IPTV content is transmitted to a storage associated with the S4 server (a "network attached storage (NAS)").   On information and belief, live TV content is cached/stored on the storage associated with the S4 server and then can be accessed by individual users. On information and belief, by continually updating and storing Live TV content on the S4 server, the TV content does need to be re-transmitted over satellite to be viewed by each individual user on the aircraft.

115.    On information and belief, the system of the Accused Product includes on-board hardware processors used to service and deliver the IPTV content, including hardware processors on the M3 modem and S4 server.   On information and belief, the on-board NAS storage generates an indication of the NAS device having a secure region comprising a buffer for streaming media, which indication is received by processors on the M3 modem.   Further, on information and belief, the Accused Product system encrypts external storage devices including the storage associated

with the S4 server such that the NAS has a secure region controlled by the media control system of the Accused Product.

116. On information and belief, upon proper authorization of a user's device, the system is able to transmit digital IPTV content from the secure region of the storage associated with the S4 server so that it can be played back on separate display devices. On information and belief, the digital IPTV content stored on the NAS associated with the S4 server is transmitted for playback to seatback display devices or users' personal devices, which are separate display devices from the buffer, as recited in the claim.

117. Further, on information and belief and as discussed above, Viasat's onboard system uses VUDRM, a multi-vendor, multi-device DRM service, which keeps content protected and not viewable on unauthorized devices, and media content is further encrypted using AES encryption, using per-item encryption keys. On information and belief, control instructions are transmitted to the S4 server to permit access to the digital IPTV content stored thereon.

118. As a direct and proximate result of Defendants' willful infringement of the '667 Patent, Plaintiffs have been and continue to be damaged. Plaintiffs have also suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law unless Defendants' infringement is enjoined by this Court.

**COUNT FOUR: INFRINGEMENT OF THE '400 PATENT**

119. Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

120. Plaintiffs own, by assignment, all rights, title, and interest in and to the '400 Patent, including the right to sue and recover for infringement thereof. Plaintiffs own all rights, title and interest in the '400 Patent by virtue of a properly executed series of assignments and/or licenses flowing from the inventors to Plaintiffs.

121.     Viasat, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '400 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States.  In so doing, Viasat has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '400 Patent, including claim 1.

122.     On information and belief, Viasat has had knowledge of the '400 Patent at least as of the date that Western Digital Technologies, Inc., Western Digital Ireland Ltd., Sandisk 3D IP Holdings LTD., Sandisk Technologies LLC, and SDSM filed *Sandisk I*, which asserted the '400 Patent against Viasat..

123.     On information and belief, given Viasat's detailed knowledge of the accused IPTV/Live TV systems it makes and operates and/or causes others to operate, and Viasat's role in deploying and supporting those IPTV systems for customers, Viasat has had actual knowledge of its infringement of the '400 Patent since the time of the service of the 2022 Complaint, if not before.  At the least, Viasat has had knowledge of its infringement of the '400 Patent via the IPTV/Live TV systems since the *Sandisk I* plaintiffs explained their infringement allegations as to that patent and those systems during the pendency of *Sandisk I* as of at least early 2025.

124.     Viasat's knowledge of the asserted '400 Patent and of Western Digital and Sandisk's enforcement efforts in *Sandisk I*—combined with Viasat's position that IPTV is a separate product and the court's ruling that IPTV was not accused in the prior litigation—put Viasat on notice that its IPTV product and associated ground/onboard components would be the subject of a separate action, as pleaded here.  Viasat has known, or has been willfully blind to, the fact that making, using, offering to sell, selling, and/or importing the Accused Product into the United States would constitute infringement.

125.    Further, in any event, Viasat has had actual knowledge of its infringement of the '400 Patent since no later than the filing date of this Complaint.

126.    In addition, as of the time the 2022 Complaint was served, as of the time the *Sandisk I* plaintiffs explained their relevant infringement allegations during *Sandisk I*, or at least as of the service of this Complaint, Viasat has induced, and continues to induce, infringement of one or more claims of the '400 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others— including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers including Gigcasters—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Viasat has promoted use of the Accused Product and participated in encouraging customers to use functionality of the Accused Product that is covered by the '400 Patent.  For example, Viasat promotes advantages of the Accused Product enabled by Claim 1 of the '400 Patent, stating that "IPTV allows: access to live news without relying on streaming services [and] SATCOM TV viewing without impacting mission-critical, bandwidth intensive communications . . . ."[27]  Through these and other statements promoting the Accused Product, Viasat intends and induces customers including airlines, military customers, and passenger end users to adopt and deploy the Accused Product in an infringing way, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Viasat's acts of inducement also include providing installation services, information, and instructions and providing the Accused Product to others.  In summary, Viasat induces infringement of the '400 Patent by advertising, encouraging, and promoting the Accused Product, including its specific

---

[27] Viasat, *Innovations that Amplify Mission-Critical Airborne Technology* (Jan. 13, 2026), https://www.viasat.com/products/software-and-services/airborne-technology/.

infringing functionality, to airline customers, private aviation customers, military customers, passengers, and others, by providing documentation and instructions describing operation and use of the accused features, as well as by providing ongoing support to enable customers and end users to access and use the Accused Product functionality during flights.  Viasat has done so with knowledge of the '400 Patent and knowledge that the encouraged acts constitute infringement.

127.    Further, on information and belief, Viasat knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '400 Patent.  The hardware, software, products, and services supplied by Viasat in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Viasat are a material part of the invention of the '400 Patent.  Accordingly, in violation of 35 U.S.C. § 271(c), Viasat is also contributing, directly and/or through intermediaries, to the direct infringement of the '400 Patent.

128.    Gigcasters, in violation of 35 U.S.C. § 271, including § 271(a), has infringed and continues to infringe, directly and/or through intermediaries, one or more claims of the '400 Patent by making, using, selling, offering for sale, and/or testing the Accused Product within the United States.  In so doing, Gigcasters has, without authority from Plaintiffs, practiced either literally or under the doctrine of equivalents at least one claim of the '400 Patent, including claim 1.

129.    On information and belief, given Gigcasters' close relationship with Viasat, given that the '400 Patent was asserted in *Sandisk I*, and given Gigcasters' detailed knowledge of the accused IPTV/Live TV systems, including the systems that Gigcasters makes, operates and/or causes others to operate, and Gigcasters's role in deploying and supporting its systems for the accused IPTV system, Gigcasters had actual knowledge of the '400 Patent and its infringement as

of or around the time the 2022 Complaint was served, or at least when the *Sandisk I plaintiffs* explained their relevant infringement allegations during *Sandisk I*.

130.    Further, in any event, Gigcasters has had actual knowledge of its infringement of the '400 Patent since no later than the filing date of this Complaint.

131.    In addition, as of the time the 2022 Complaint was served, as of the date the *Sandisk I plaintiffs* explained their relevant infringement allegations in *Sandisk I*, or at least as of the service of this Complaint, Gigcasters has induced, and continues to induce, infringement of one or more claims of the '400 Patent in violation of 35 U.S.C. § 271(b) by actively encouraging others—including airline customers, military customers, private aviation customers, end users (air travelers), and other service providers—to use, offer to sell, sell, and import the Accused Product in an infringing manner.  For example, Gigcasters has promoted use of the Accused Product and participated in encouraging airline customers to use functionality of the Accused Product that is covered by the '400 Patent.  For example, Gigcasters representatives, including its CFO Nate LaTour, technical product manager Sita (Sangeetha) Sasi, and investor Sean T. Barnicle, among others, have all promoted the Accused Product, including advantages enabled by Claim 1 of the '400 Patent, including in the statements by these individuals identified above.  Through these and other statements promoting the accused IPTV/Live TV functionality, Gigcasters intends and induces customers including airlines, military customers, and passenger end users to adopt and deploy the Accused Product, and further intends and induces customers to encourage passengers to use the Accused Product for entertainment and/or education during flights.  On information and belief, Gigcasters' acts of inducement also include providing installation services, information, and instructions for and/or relating to the Accused Product.  In summary, Gigcasters induces infringement of the '400 Patent by advertising, encouraging, and promoting the Accused Product

to customers, passengers, military customers, and others, by providing documentation and instructions describing operation and use of the accused features, and by providing ongoing support to enable customers and end users to access and use the Accused Product functionality during flights. Gigcasters has done so with knowledge of the '400 Patent and knowledge that the encouraged acts constitute infringement.

132.    Further, on information and belief, Gigcasters knows that the hardware, software, and other products and services it provides as part of the Accused Product are especially made or especially adapted for use in the infringement of the '400 Patent. The hardware, software, products, and services supplied by Gigcasters in the Accused Product are not staple articles or commodities of commerce suitable for substantial non-infringing use, and these infringing components provided by Gigcasters are a material part of the invention of the '400 Patent. Accordingly, in violation of 35 U.S.C. § 271(c), Gigcasters is also contributing, directly and/or through intermediaries, to the direct infringement of the '400 Patent.

133.    On information and belief, Viasat directs and controls the actions of Gigcasters with respect to its contributions to the Accused Product. In the alternative, Gigcasters and Viasat have entered into a joint enterprise by having an agreement between them, a common purpose, a community of pecuniary interest, and an equal right of control over the Accused Product.

134.    Claim 1 of the '400 Patent recites:

1. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:

   a first data interface configured to communicate with a portable data storage device;

   a second data interface configured to communicate, over a network, with a remote trusted server; and

   a processor configured to:

obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;

authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and

in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

135.    The Accused Product infringes at least claim 1 of the '400 Patent.  On information and belief, the Accused Product includes a M3 modem with a VCDS client that operates in conjunction with a S4 server, and these structures include first and second data interfaces configured to communicate with (1) a portable storage device and (2) a remote trusted server that communicates authentication information.   On information and belief, live IPTV content is provided from Viasat's ground-based infrastructure via a satellite link, and the kiosk's claimed functionality is implemented by at least the onboard S4 server operating in conjunction with the VCDS client and/or M3 modem.  On information and belief, the accused system provides live DRM-protected IPTV content, which is first stored in an on-board NAS and then distributed via Wi-Fi and/or via ethernet to a plurality of portable data storage devices, such as seatback displays and/or passengers' personal devices.  The high-level architecture of the Accused System is illustrated below:[28]

---

[28] Viasat In-Flight Connectivity Solutions (January 13, 2026), https://www.viasat.com/content/dam/us-site/aviation/documents/565522_In-flight_Connectivity_011_aag.pdf



136.    On information and belief, the seatback displays and/or personal devices each include local storage/memory that receives and stores, at least temporarily, Live IPTV media content for playback after proper authentication.

137.    On information and belief, the Accused Product further includes one or more processors configured to obtain a unique identifier from the portable data storage device (whether a seatback or user device), wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device.

138.    On information and belief, when a passenger device requests specific Live TV content, the onboard kiosk receives device-specific identifier information associated with that portable storage device as part of the device's request and/or as part of a DRM/authorization workflow, and uses the identifier to authenticate the portable data storage device. In addition, on information and belief, the DRM/authorization workflow uses a device-specific identifier that uniquely identifies the device before the portable data storage device is permitted to obtain and/or

display the protected IPTV content. The system's data interfaces, as well as encryption and authentication modules for the Accused Product, are shown in the diagram below.[29]



On information and belief, and as indicated by this diagram, the kiosk authenticates and authorizes the user's personal device and/or seatback device by communicating with a remote trusted server in the IPTV Ground Segment through a Conditional Access System ("CAS") or similar DRM system via the second data interface (the satellite connection).

139.     On information and belief, the kiosk authenticates the display device using an identifier that is unique to the device, and key management servers are part of the IPTV ground segment and participate in the authentication process.

---

[29] *Sandisk I*, Dkt. 219 ¶ 186.

140.    On information and belief, the onboard kiosk communicates with the IPTV Ground Segment and includes one or more processors that, in response to the authentication, provide the portable data storage device with encrypted IPTV media content and a corresponding access key allowing the live IPTV media content to be displayed.

141.    As a direct and proximate result of Defendants' willful infringement of the '400 Patent, Plaintiffs have been and continue to be damaged. Plaintiffs have also suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law unless Defendants' infringement is enjoined by this Court.

## DEMAND FOR JURY TRIAL

142.    In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demands a jury trial on all issues triable before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully asks that the Court enter judgment against Defendants Viasat and Gigcasters as follows:

A.    That Defendants have infringed (either literally or under the doctrine of equivalents) directly, jointly, and/or indirectly by way of practicing, inducing, or contributing to the infringement of one or more claims of the Sandisk Patents;

B.    That Defendants' infringement of the Sandisk Patents was willful;

C.    For temporary, preliminary, and permanent injunctive relief enjoining the Defendants and their officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with them, from infringement, inducing the infringement, or contributing to the infringement of the Sandisk patents;

D.     For an award to Plaintiffs for their damages arising from Defendants' direct and/or indirect infringement of the Sandisk Patents, including lost profits suffered by Plaintiffs as a result of Defendants' infringement and in an amount not less than a reasonable royalty, together with pre-judgment and post-judgment interest;

E.     For an award to Plaintiffs for enhanced damages equal to treble the amount of actual damages, for the willful nature of Defendants' infringement of the Sandisk Patents.

F.     Alternatively, in the event that an injunction does not issue, for an award of a compulsory ongoing future royalty;

G.     That this Court declare this to be an exceptional case pursuant to 35 U.S.C. § 285 and award Plaintiffs their reasonable attorneys' fees;

H.     For an award to Plaintiffs of their costs and expenses;

I.     For such other and further relief as the Court may deem just and proper.


Dated:  January 21, 2026                          Respectfully submitted,

                                                  By: */s/ Leah B. Buratti*

                                                  John C. Hueston (CA State Bar No.
                                                  164921, (*pro hac vice* application
                                                  forthcoming)
                                                  jhueston@hueston.com
                                                  Christina V.  Rayburn (CA State Bar
                                                  No.  255467)
                                                  crayburn@hueston.com
                                                  Neil G.  Anderson (CA State Bar No.
                                                  307668)
                                                  nanderson@hueston.com

                                                  HUESTON HENNIGAN LLP
                                                  620 Newport Beach, CA 92660
                                                  Telephone: (949) 229-8640
                                                  Facsimile:   (888) 775-0898

                                                  Christine M. Woodin (TX State Bar
                                                  No. 24100051)
                                                  cwoodin@hueston.com

HUESTON HENNIGAN LLP
523 West 6th St., Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4099

Leah B. Buratti
State Bar No. 24064897
leah@bccaustin.com
Ryan A. Botkin
State Bar No. 00793366
ryan@bccaustin.com

BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, Texas 78701
Telephone: (512) 615-2341
Fax: (737) 289-4695

*Attorneys for Plaintiffs Sandisk
Technologies, Inc. and SanDisk
Storage Malaysia Sdn. Bhd.*